UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY MCALISTER,

                Plaintiff,           Civil Action No.: 13-12410
                                              Honorable Terrence G. Berg
     v.                              Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 16]**

Plaintiff Sherry McAlister brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 16], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") erred in failing to obtain a medical source opinion that specifically opined on McAlister's functional limitations. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be DENIED, McAlister's motion [11] be GRANTED in part to the extent she seeks remand and DENIED in part to the extent she seeks reversal and an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REMANDED for further consideration consistent with this Report

and Recommendation.

**II.    REPORT**

**A.    Procedural History**

On March 23, 2011, McAlister filed an application for SSI, alleging disability as of November 1, 2010. (Tr. 141-47).[1] The claim was denied initially on June 2, 2011. (Tr. 86-89). Thereafter, McAlister filed a timely request for an administrative hearing, which was held on January 23, 2012, before ALJ David Neumann. (Tr. 37-43). After learning McAlister was not represented, the ALJ adjourned the hearing to permit her time to obtain counsel, and took additional information in order to obtain medical records. (*Id.*). On April 23, 2012, McAlister again appeared before the ALJ for a hearing, represented by attorney Andrea Hamm. (Tr. 44-77). At the hearing, McAlister testified, as did vocational expert ("VE") Elizabeth Pasikowski. (*Id.*). On May 17, 2012, the ALJ found McAlister not disabled. (Tr. 20-35). On May 1, 2013, the Appeals Council denied review. (Tr. 1-6). McAlister filed for judicial review of the final decision on June 3, 2013. [1].

**B.    Framework for Disability Determinations**

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

---

[1] Although she filed for SSI claiming this onset date, her onset date was modified to March 21, 2011, per the ALJ, who, at the beginning of the hearing, noted that for sole claims of SSI, benefits do not become payable until the month after the application is filed. (Tr. 49). Later in the hearing, when it was determined that McAlister had engaged in substantial gainful activity in 2011, her onset date was again amended to December 11, 2011.

2

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C.    Background**

   *1.    Plaintiff's Testimony and Subjective Reports*

McAlister reported that the conditions preventing her from working are neck and back problems.  (Tr. 167).  She had completed the eighth grade and was a certified nursing assistant.  (Tr. 167-68).  She most recently worked as a hair stylist from 2008 through 2010.  (Tr. 168).

3

McAlister testified to sustaining her injuries in two separate motor vehicle accidents – one in 2009 and a second in December 2011. (Tr. 50-51). McAlister testified that she felt okay immediately after the first accident, but then began feeling pain in her neck and back shortly thereafter and went to the emergency room. (Tr. 50). McAlister reported having received treatment for this pain from a pain clinic and a physical therapy clinic for her conditions. (Tr. 170-71). Her condition worsened after the second accident, including a reduced range of motion and numbness in her arms and legs. (Tr. 52). She starts experiencing numbness in her hands approximately 15 minutes after she begins using them. (Tr. 64). She continued to treat with the pain clinic, including receiving injections since 2009, although those injections no longer work and she needs to change medications. (Tr. 52; 66-69). Her present medications include Lyrica and Percocet. McAlister testified that the Percocet makes her drowsy, although she did not report any side effects from her medications in her subjective reports and did not report these side effects to her doctor. (Tr. 65-66). She also continued with physical therapy, but neither treatment is improving her condition. (Tr. 53). She testified that her pain management doctor is intending to refer her for a surgical consultation. (Tr. 71).

McAlister testified she can stand and sit for an hour each, and walk for one to two hours. (Tr. 54-55). She can lift about eight pounds, like a gallon of milk. (Tr. 55). She can squat, but cannot bend or kneel. (Tr. 55-56). She testified that she usually goes to bed at eight and gets up at five every morning, although she is restless throughout the night. (Tr. 56-57). She naps about two to three hours every day. (Tr. 57). She can take care of herself, dress, shop and cook, although her eldest child does most of the cooking and she testified that when she shops her children (she has four) carry the heavy groceries. (Tr. 57; 65). They also do the dishes. (Tr. 64). McAlister can do laundry and sweep, but not vacuum or mop. (Tr. 58; 65). She can drive one to

two hours at a time. (Tr. 58-59). She spends most of her day lying on the couch and napping, as lying down is her most comfortable position. (Tr. 59; 70). She does not engage in any social activities. (Tr. 59-60). She has not told her doctors that she spends 80% of her day lying down. (Tr. 71).

    2. *Medical Evidence*

      a. *Prior to Alleged Onset Date*

The majority of the medical evidence of record pertains to a time prior to McAlister's amended onset date. Therefore, that evidence will be summarized to the extent necessary to inform as to the status of her condition prior to the second automobile accident, the event upon which her alleged onset date is premised.

McAlister sustained injuries in her first automobile accident on January 18, 2009. Although she testified to being seen in the emergency room shortly after, there are no emergency room notes in the record. The first treatment notes after this accident are from almost a month later on February 5, 2009. (Tr. 214). On that date, McAlister began treating with VanDyke Rehabilitation Center, complaining of frequent and severe headaches, right leg numbness and memory problems. (*Id.*). Orthopedic tests conducted on that date revealed a number of positive results, including a positive compression test, shoulder depression test, cervical distraction test, right straight leg raising test and Braggard's test. (Tr. 215). Both cervical and lumbar spine range of motion ("ROM") was reduced and moderate to severe muscle spasms were noted. (Tr. 216). Motor function was normal, sensory perception was abnormal and there was paraspinal tenderness noted in all three areas of the spine. (*Id.*). McAlister began treating initially on a weekly basis, noting improvement in her condition after treatment, although it was temporary. (Tr. 235-36). During that same time she also complained of exacerbation of pain, radicular

symptoms and memory problems. (*Id.*). The doctor advised her to "abstain from any household, occupational, or recreational type activities that involve bending, lifting, twisting, pushing, pulling, prolonged sitting or standing." (Tr. 236).

Over the course of the next two years, the doctor continued to treat McAlister on an increasingly less frequent basis, with the last treatment notes in the record being for service on March 8, 2011. (Tr. 217-234). The synopsis of these numerous appointments is that McAlister's condition improved somewhat, more so as related to her lumbar and dorsal spine as compared to her cervical spine. (*See e.g.*, Tr. 225-26; 228). She had periods of relief accompanied by periods of exacerbation, and the relief she received from treatment was always temporary. (*See generally*, Tr. 214-36). While there were not always orthopedic test results at each appointment, on several occasions, cervical and lumbar spasms were noted and limited cervical range of motion was identified. (Tr. 218; 220; 222; 224). Despite this, the doctor continued to note positive changes and improvement, and certain symptoms, such as headache and memory loss, are not reported in later treatment notes, and thus appear to have resolved. (Tr. 217-230). Regardless, the doctor continued to limit McAlister's daily activities in accordance with his initial recommendations. (Tr. 217-234). At the second to last appointment of record, the doctor stated that he would like to see McAlister follow up with a neurosurgeon, as he believed more aggressive treatment may be helpful. (Tr. 217). At the last appointment, he opined that he believed some of McAlister's pain "is ultimately permanent." (*Id.*).

An MRI of McAlister's lumbar spine taken on March 26, 2009, was normal. (Tr. 239). A cervical MRI revealed a subligamentous central herniation at C6-C7. (Tr. 237-38). McAlister began treating with Dr. Samuel Perov at the University Pain Clinic on July 22, 2009. (Tr. 296-99). An exam revealed a normal gait, erect posture, normal range of motion and a "pretty stable"

spine. (Tr. 298). Dr. Perov noted positive facet loading on the right, and a negative straight leg raising test, with no spinal tenderness. (*Id.*). He noted a questionable Spurling test. (*Id.*). Sensations were intact, muscle strength was full and there was no atrophy. (*Id.*). He diagnosed McAlister with lumbar and cervical facet arthropathy and lumbar and cervical radiculopathy, and requested her imaging studies. (*Id.*). Dr. Perov reviewed McAlister's March MRI results at her next appointment in August 2009. (Tr. 295). At that appointment, McAlister listed her pain as a 7/10, although her best pain level during the interim was reported at 4/10. (*Id.*). An exam revealed positive tenderness to palpation in cervical and lumbar spine, but negative SI joint pain. (*Id.*). Dr. Perov continued to diagnose McAlister with lumbar radiculopathy and facet arthropathy and cervical radiculopathy, and he adjusted her medications. (*Id.*).

Despite the normal lumbar MRI results, McAlister continued to complain of lumbar pain, in additional to cervical pain, at subsequent appointments with Dr. Perov in September and November 2009. (Tr. 291; 408). During that time period her pain was at best 0/10 with medication, at worst 10/10, although more often it was about 4-5/10. (*Id.*). She was found to have good strength in all joints, but still tender in her lumbar and cervical spine. (*Id.*). By November, McAlister had agreed to undergo cervical facet injections. (Tr. 291). McAlister underwent her first nerve block on December 16, 2009. (Tr. 274). She underwent a second block on January 27, 2010, where she reported receiving 100% relief. (Tr. 273). On February 24, 2010, McAlister attempted to undergo a rhizotomy, as a result of "marked decrease in pain with diagnostic cervical facet blocks." (Tr. 270). The procedure appears to have been aborted due to anatomy. (Tr. 272). At a follow-up appointment on March 24, 2010, McAlister reported her pain level at a 5/10, with constant back pain and a usual pain level of 8/10. (Tr. 289-90). She also reported that she was working and doing housework, which she had not been doing

previously. (Tr. 289). Dr. Perov diagnosed cervical radiculopathy and cervical facet arthropathy, recommended physical therapy and adjusted her medications. (*Id.*). At another follow-up on April 28, 2010, McAlister reported a pain level of 6/10, with an average pain level of 10/10. (Tr. 288). She reported still doing housework, but not working. (Tr. 287). An exam revealed a normal cervical range of motion, no lumbar tenderness, and full strength in all extremities. (*Id.*). He diagnosed her with herniation at C6-C7 and cervical radiculopathy and managed her medications. (Tr. 287).

Dr. Perov continued to treat McAlister through the remainder of 2010. Over the course of the year, management of her medications resulted in "much improved" pain level, although her pain remained between 4-6/10 usually. (Tr. 275-85; 281). She reported that her medications controlled her pain well and that they had no side effects. (Tr. 283-85). During this time, exams revealed a negative straight leg raising test, a normal gait, negative facet loading, no paraspinal tenderness and no strength loss, but no changes in functional ability either. (Tr. 275; 279). Also, in August, she underwent another rhizotomy, but reported afterward that it did not help her pain. (Tr. 268; 279).

McAlister also treated with Dr. Perov during all of 2011, with her last appointment that year occurring in November. (Tr. 331). During that time she received three nerve blocks, in January, May and October, with the best outcome in October, which reduced her pain to from 8/10 to 2/10. (Tr. 306; 218; 328). At follow-up appointments during this year, McAlister's pain continued to improve, as reported by her. (Tr. 308; 311; 314; 321; 331). On average, her pain during this time was between 2-4/10, and sometimes as low as 1/10. (Tr. 308-33). She also reported that the pain only "rarely" or "occasionally" interfered with her ability to perform activities of daily living. (*Id.*). She reported no side effects to her medications. (*Id.*). Exams

during this period consistently revealed no pain on palpation, normal cervical range of motion, normal strength, motor function and reflexes, intact sensation, and a normal gait. (Tr. 309; 312-13; 315-16; 322-23; 326-27; 332-33).

Also prior to McAlister's modified onset date, on May 24, 2011, she underwent a consultative physical examination with Dr. Atul Shah. (Tr. 246-53). The exam revealed no tenderness in the lumbosacral spine and no muscle spasms, atrophy or weakness. (Tr. 247-48). There was mild restriction in both cervical and lumbar range of motion and mild paraspinal tenderness in the cervical spine, but the gait was normal, albeit slow and sensations and reflexes were intact. (*Id.*). Dr. Shah opined that McAlister had chronic cervical myositis, chronic cervical radiculopathy, bilateral; rule out disc disease, chronic lumbar myositis, mild in nature, and chronic pain syndrome, mild to moderate in intensity. (Tr. 248). He further opined that, due to these conditions, McAlister had "moderate restrictions for occupational ability" including "limitations for walking, standing and climbing the stairs and ladders." (*Id.*). However, he did not specify any other particular "limitations." (*Id.*).[2]

### b. Subsequent to Initial Alleged Onset Date

On December 11, 2011, McAlister was in another auto accident, and she treated with Dr. Syed Moosavi on December 27, 2011, complaining of ongoing headaches, lightheadedness and right eye pain. (Tr. 344-45).[3] Her pain was 7/10 and at worst 10/10, occurring daily and

---

[2] Based on Dr. Shah's opinion, a single decision maker for the Administration generated a residual functional capacity assessment for McAlister, limiting her to lifting 10 pounds occasionally, 5 pounds frequently, standing 2 hours in an eight-hour work day and sitting for 6, unlimited push and pull, and a sit/stand option. (Tr. 83). She was also limited to only occasional climbing of ramps, stairs, ladders and scaffolds, balancing, stopping, kneeling, crouching and crawling. (Tr. 83-84).

[3] Although there are no emergency room reports in her file, McAlister reported to Dr. Moosavi that she went to the emergency room following the accident and that x-rays taken there were

9

constant and throbbing. (*Id.*). She also reported having right arm numbness and increased low back pain with tingling into the foot, which was 6/10 currently and 9/10 at its worst. (*Id.*). She reported being independent with her activities of daily living. (*Id.*). An exam revealed paraspinal tenderness in the cervical and lumbar regions, normal range of motion, sensation and gait, full strength and normal reflexes. (Tr. 345). A facet loading test was negative bilaterally, as well as a Romberg's test. McAlister was able to tandem walk. (*Id.*). Dr. Moosavi ordered MRIs and prescribed physical therapy and Flexeril. (*Id.*; Tr. 349). He also recommended an EMG if radicular symptoms persisted. (*Id.*). Finally, he completed a disability certificate for McAlister until tests could be completed and reviewed, which limited her from working, housework and driving. (*Id.*; Tr. 350). An MRI of McAlister's cervical spine taken on January 6, 2012, revealed "very mild diffuse disc bulges at C5-C6 and C6-C7 without underlying spinal stenosis." (Tr. 357). An MRI of her lumbar spine taken the same day was normal. (Tr. 356).

McAlister returned to Dr. Perov on January 25, 2011. (Tr. 334). She reiterated her reports of constant headache pain ranging from 7-10/10, pain with movement and numbness in her upper extremities. (*Id.*). She reported that this pain occasionally interfered with her activities of daily living. (*Id.*). An exam revealed a normal cervical range of motion and normal strength. (Tr. 335). There was no tenderness or pain with motion in her upper extremities and her sensation was intact. (Tr. 335-36). Dr. Perov continued to diagnose her with cervical radiculopathy and cervical spondylosis without myelopathy and managed her medications. (Tr. 336).

On January 31, 2012, McAlister returned to Dr. Moosavi. (Tr. 343). She continued to report pain in both her cervical and lumbar spine ranging from 7-10/10. (*Id.*). She reported

---

negative. (Tr. 344).

having been discharged from physical therapy. (*Id.*). An exam revealed a positive Tinel's test on the right greater than left, a negative straight leg raising test, preserved manual muscle testing, good reflexes, normal gait and a normal range of motion in all areas. (*Id.*). There was mild paraspinal tenderness over the cervical and lumbar regions, however. (*Id.*). Dr. Moosavi recommended an EMG to rule out carpal tunnel syndrome and recommended she follow up with the pain clinic relative to her MRI results. (*Id.*). He also completed another disability certificate for her but did not insert an end date. (Tr. 347). On February 8, 2012, McAlister underwent another nerve block with Dr. Perov. (Tr. 358). After the procedure, McAlister rated her pain at 3/10, which was a 70% improvement since prior to the block. (*Id.*). There are no more treatment notes in the record.

### c.     Records Submitted to Appeals Council

On March 6, 2012, Dr. Moosavi completed a medical source statement for McAlister, finding her able to sit and stand for four hours each a day, and walk a total of five hours a day. (Tr. 438). He also found she could lift 10 pounds occasionally, push the same amount but only pull or carry 5 pounds occasionally. (Tr. 438-39). He found she could occasionally bend. (Tr. 438). He required her to have a sit/stand option. (Tr. 439). He based his limitations on "neck pain/disc bulge" and "[left] shoulder pain." (*Id.*). On April 10, 2012, Dr. Moosavi again prescribed physical therapy for McAlister, and completed another disability certificate through May 10, 2012. (Tr. 436-37).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found McAlister not disabled. At Step One the ALJ determined that McAlister had not engaged in substantial gainful activity since her amended alleged onset date of December 11, 2011. (Tr. 25). At Step Two he found she had

the following severe impairment: "mild disc bulging of the cervical spine." (*Id.*). At Step Three he determined that her impairment did not met or medically equal any listed impairment. (*Id.*). The ALJ then assessed McAlister's residual functional capacity (RFC), finding her capable of light work

> except that claimant can lift or carry 10 pounds frequently and 20 pounds occasionally . . . ; the claimant can stand and/or walk (with normal breaks) for a total of 2 hours in an 8-hour workday; the claimant can sit (with normal breaks) for a total of 6 hours in an 8-hour workday; the claimant requires a sit/stand option at the workstation while remaining at the workstation . . . the claimant should avoid frequent ascending and descending of stairs; can perform pushing and pulling motions with the upper and lower extremities within the aforementioned weight restrictions; and can occasionally climb, balance, stoop, crouch, kneel, and crawl, but never climb ladders or ropes.

(Tr. 25-26). In making this determination, the ALJ gave great weight to the opinion of Dr. Shah, stating that his restrictions "have been incorporated in the claimant's residual functional capacity assessment." (Tr. 27). He gave little weight to Dr. Moosavi's disability certificates as medical opinions, concluding that Moosavi may not be familiar with the applicable definition of "disabled," and suggesting that Moosavi "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant" in rendering those certificates. (Tr. 29). At Step Four the ALJ concluded, with the aid of VE testimony, that based on the foregoing RFC, McAlister was capable of returning to her past relevant work as a hair stylist, which was skilled, light work. (Tr. 31). Therefore, she was not disabled. (*Id.*).

## E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is

13

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

McAlister argues that the ALJ erred in giving great weight to the opinion of Dr. Shah when that opinion was rendered prior to her alleged onset date, and prior the aggravating circumstance that was her second car accident. She argues that the ALJ should have instead given great weight to Dr. Moosavi's disability certificates, being the only opinion of record within the relevant time period. She argues that, at a minimum, the ALJ should have obtained an updated medical opinion in light of the intervening circumstances of McAlister's December 2011 car accident. She further argues that the ALJ erred in not considering her carpal tunnel syndrome, headaches, lightheadedness and low back pain as severe impairments, or incorporating them into his RFC.

The Commissioner argues that there is no error in giving great weight to a consultative opinion that does not account for the entire time period of record. She also argues that the ALJ did not err in not finding these other impairments severe where they were solely the product of McAlister's subjective reports and not verified by any objective medical evidence.

The Court finds that the ALJ erred in this case, not due to his reliance on the opinion rendered prior to an alleged worsening of McAlister's condition, but because he generated limitations based on and attributed to that opinion, but which are found nowhere in that opinion. Dr. Shah's consultative statement, the only true medical source statement before the ALJ (the Court agrees with the Commissioner that the ALJ gave good reasons for discounting Dr.

14

Moosavi's disability certificates as medical source statements), did not itself outline any specific functional limitations in terms of hours of standing, walking, sitting, postural activities or weights that could be lifted or carried. (Tr. 248). He simply opined as to all of these things, that McAlister would have "moderate restrictions for occupational ability" due to her conditions and "limitations" in her ability to perform these functions, although never specifying what those limitations are. (*Id.*). The ALJ stated in his opinion that he "incorporated" Dr. Shah's limitations into his RFC assessment (Tr. 27), but given the fact that Dr. Shah did not actually issue any specific "limitations," these portions of the ALJ's RFC appear to have been created out of whole cloth. This was error requiring remand. *See Lindsey v. Comm'r of Soc. Sec.*, No. 12-12585, 2013 U.S. Dist. LEXIS 165779, *19-20 (E.D. Mich. Sept. 26, 2013) *adopted by* 2013 U.S. Dist. LEXIS 164913 (E.D. Mich. Nov. 20, 2013) (classifying as error ALJ's making of own medical finding regarding RFC limitations). While in *Lindsey*, the ALJ did not even elicit the opinion of a medical expert, but instead appeared to rely on the opinion of the single decision maker, these two cases are more similar than different.

Here, although a medical expert's opinion was in the record, its findings were at best ambiguous, exemplified by the fact that the single decision maker in this case actually issued limitations different and even more restrictive than those the ALJ generated, although apparently based on the same consultative opinion. (*See* Tr. 83-84 (limiting McAlister to lifting only 5 pounds frequently and 10 pounds occasionally, based on the consultative examination findings)).[4] No doctor, or any other witness opined that McAlister was capable of lifting 10

---

[4] The Court acknowledges that even under the single decision maker's more limited RFC, McAlister was still considered not disabled. And, this Court is not opining that the ALJ was required to rely on the RFC of the single decision maker. In fact, the opinion of a single decision maker is not evidence that an ALJ or this Court can rely on to make a decision regarding disability. *See Berger v. Comm'r of Soc. Sec.*, No. 12-11779, 2013 U.S. Dist. LEXIS 116399,

pounds frequently and 20 pounds occasionally. While the Court recognizes that there are situations where "the medical evidence shows relatively little physical impairment" such that "an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment," the Court finds that this is not one of those cases. *Deski v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008). For instance, McAlister was originally diagnosed with a disc herniation in her cervical spine, resulting in more than two years of treatment with a pain specialist and recommendation for a neurosurgical consult. (Tr. 217-18; 237-38; 268; 270; 296-99; 306; 328). During her treatment she received nerve injections as well as rhizotomies for her condition. (*Id.*). She was routinely advised to limit her activity. (Tr. 217-34; 236). When she again injured her cervical spine in the second car accident, she was diagnosed with disc bulging, provided with disability certificates, recommended for further objective testing and physical therapy and given another nerve block injection. (Tr. 334; 344-45; 357; 393). Overall, the objective medical evidence in this case shows more than simply a "relatively minor physical impairment" for which an ALJ could make a commonsense decision about functional capacity.

Because the ALJ created RFC limitations based only on his own review of the medical evidence instead of eliciting a specific medical opinion as to McAlister's residual functional capacity, the Court finds itself unable to undertake an appropriate substantial evidence review.

---

*23-37 (E.D. Mich. July 23, 2013) *adopted* by 2013 U.S. Dist. LEXIS 115894 (E.D. Mich. Aug. 16, 2013). The ALJ, just like this Court, must perform an independent review of the evidence. *Id.* The Court simply notes this as illustrative of the ambiguous nature of the consultative examiner's medical opinion, and that the opinion failed to give specific functional limitations, instead allowing for non-expert interpretation, which clearly varied between the single decision maker and the ALJ. While it may ultimately be the case that McAlister could return to her past relevant work even with more limited restrictions, or that she could adjust to other work in the national economy, the lack of any restrictions imposed by any physician in the record requires this Court to recommend remanding the case to the ALJ so that these issues may be fleshed out in full.

As such, the Court cannot say that the ALJ's conclusion that McAlister can return to her past relevant work is supported by substantial evidence of record, and the case should be remanded for further consideration consistent with this Report and Recomendation.[5]

### III. CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that McAlister's Motion for Summary Judgment **[11]** be **GRANTED IN PART** to the extent she requests remand and **DENIED IN PART** to the extent she seeks reversal and automatic award of benefits, the Commissioner's Motion **[16]** be **DENIED**, and this case be **REMANDED** for further consideration consistent with this Report and Recommendation

Dated: July 9, 2014  
Ann Arbor, Michigan

s/David R. Grand  
DAVID R. GRAND  
United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991);

---

[5] Because the Court finds that the instant error requires remand, it does not opine on McAlister's other arguments. However, on remand, the ALJ should consider the additional evidence that McAlister submitted to the Appeals Council, along with any other evidence of disability generated after the date of the ALJ's opinion.

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 9, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
